IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| TAMSEN REID<br><br>Plaintiff,<br><br>vs.<br><br>SCOTT R. WOMACK,<br>BOX ELDER COUNTY, et al.,<br>Defendant. | **MEMORANDUM OPINION AND ORDER** |
| TALIA BUCK,<br>Plaintiff,<br><br>vs.<br><br>SCOTT R. WOMACK, et al.,<br>Defendants. | Case No. 2:11-CV-788<br><br>Judge Dee Benson |
| HOLLY GRIFFIN,<br>Plaintiff,<br><br>vs.<br><br>SCOTT R. WOMACK, et al.,<br>Defendants. | |

Presently before the court are the following two motions: (1) Defendant Sheriff Lynn

Yeates' ("Sheriff Yeates") and Defendant Box Elder County's (the "County") Motion for

Summary Judgment (Dkt. No. 108), and (2) Plaintiffs' Motion to Strike Defendants' Pleadings &

for Entry of Default (Dkt. No. 123.) Also before the court is Defendants' Objection to Plaintiffs

use of the Affidavit of Sarah S. Sorensen in Opposition of Defendants' Motion for Summary

Judgment. (Dkt. No. 130.) The court held a hearing on the motions and on the objection on April 30, 2014. At the hearing, Plaintiff Talia Buck was represented by Aaron Bergman, Plaintiffs Tamsen Reid and Holly Griffin were represented by Robert B. Sykes, and Defendants Box Elder County and Sheriff Lynn Yeates were represented by Frank D. Mylar. The court took the matter under advisement. The court has considered the memoranda and other materials submitted by the parties, as well as the law and facts relating to the motions. Now being fully advised, the court renders the following Memorandum Decision and Order.

## INTRODUCTION

These motions stem from motor vehicle traffic stops performed by Defendant Scott Womack ("Womack"), a former patrol deputy with the Box Elder County Sheriff's Office ("BECSO"), involving the three Plaintiffs in November, 2010. During each traffic stop, Plaintiffs assert that Womack asked to inspect their tattoos and/or asked to view their pelvic and abdomen regions which required raising their shirts and/or lowering their pants. Plaintiffs assert Sheriff Yeates and the County caused their substantive due process rights to be violated and that Sheriff Yeates' and the County's failures to train and supervise Womack led directly to the violation of Plaintiffs' constitutional rights. Plaintiffs also assert Defendants' knowing and deliberate indifference to Womack's conduct precludes any defense of qualified immunity. Furthermore, Plaintiffs claim their state constitutional claims are self-executing, require no bond for Defendants' attorney's fees, and are not adequately remedied under 42 U.S.C. § 1983. Defendants do not contest the allegations about Womack's conduct. They move for summary judgment on the grounds that Plaintiffs cannot prove, as § 1983 requires, that they caused the constitutional violations or were deliberately indifferent to the risk that would happen.

## BACKGROUND

The court construes the facts underlying the grant of summary judgment in the light most favorable to Plaintiffs as the non-moving party, *Ribeau v. Katt*, 681 F.3d 1190, 1194 (10th Cir. 2012), and recounts those facts as follows.

### Jami Ruppe

On August 20, 2010, Jami Ruppe's vehicle was pulled over by Womack. (Pls.' Opp. Summ. J. at xxvii.) During the stop Womack demanded to see her breasts. (*Id.*) Jami Ruppe complied and removed her clothing. (*Id.*) She showed Womack her breasts, underneath her pants, and her pelvis. (*Id.*) Jami Ruppe called Linda Bourne, the Chief of Police of Garland City, to report the incident on the same day. *(Id.)* Linda Bourne advised Jami Ruppe that Womack was not a Garland City officer, and told her to "call Lynn Yeates" at the BECSO. (*Id.*) The next day, a Saturday, Jami Ruppe called the BECSO and "talked to Lynn's secretary, I do not remember her name." (Ex. 14, Ruppe Depo. 54:14-15.) Ruppe claims that she relayed the entire incident to the woman on the phone and the woman asked Jami Ruppe if she wanted to file a report and a complaint, to which Jami Ruppe replied "yes." (*Id.*) Ruppe received a form, which she filled out and mailed back to the BECSO within four days. (Ex. 14 Ruppe Depo. 36:21-37.)

### Mischelle Nielson

Mischelle Nielson's ("Nielson") vehicle was pulled over by Womack in mid-August 2010. (Ex. 18, Nielson Depo. 5:23-6:3.) Womack told Nielson that "We have another person who has the same name as you, same birthday as you, you know, and I need to know if you have other tattoos and can I see them?" "And he wanted to know if I had tattoos anywhere that was covered." (Ex. 18, Nielson Depo. 7:19-21; 8:18-19.) Nielson called the number for the BECSO to complain about Womack's actions on the same day Womack pulled her over. (*Id.*) Nielson

testified at her deposition that she spoke to a state dispatch employee, not Sheriff Yeates or any BECSO employee. (*Id*.)

Lindsy Gibbs

Lindsy Gibbs ("Gibbs") was pulled over by Womack on October 1, 2010. (Pls.' Opp. at xxviii.)  Womack told Gibbs he had a warrant for someone with the same name as Gibbs and needed to see her tattoos on the private areas of her body, i.e., on her "abdomen." (*Id*.)  Gibbs reported this incident to Sheriff Yeates wife, Lynda Yeates.  She is not sure about the date, stating in her deposition that it may have been one month after the incident ("I think it was a month to the day") but also acknowledged that she is unsure of the exact date because the event occurred two years prior to her deposition. (Ex. 15, Gibbs Depo. 8:21-9:12.)  Lynda Yeates confirms that she received the report from Gibbs, testifying in her deposition that she told Sheriff Yeates about her conversation with Gibbs around Thanksgiving, on November 21or 22, and that she remembers Sheriff Yeates writing something in his day planner immediately after. (Ex. 16, Lynda Yeates Depo. 9:17-23.)  It is undisputed that the following Monday, November 22, 2010, Sheriff Yeates ordered Sergeant Spencer, Womack's direct supervisor, to open an investigation on Womack. (*Id*. at ¶ 24.)

Holly Griffin

Womack pulled over Holly Griffin ("Griffin") at about 11:30 p.m. on a date somewhere between November 15 and November 19, 2010. (Ex. 17 Griffin Depo. 5:19-6:2.)  Womack claimed she had no auto insurance. (*Id*.)  This turned out to be incorrect as Griffin showed Womack her auto insurance card. (*Id*.)  Womack then threatened to take Griffin "to jail for fingerprinting," and on the pretext of looking for tattoos, Womack made Griffin pull up her pant legs to show him her legs, to lift up her shirt to expose her stomach, and to pull down her pants

to show him her upper thighs. (Ex. 17, Griffin Depo. 10:4-11:12.)  Griffin did not report her confrontation with Womack until October 11, 2011. (*Id*.)

<u>Tamsen Reid</u>

Tamsen Reid ("Reid"), then aged 17, and some friends were pulled over by Womack on November 20, 2010. (Ex. 19, Reid Depo. 24:24-25:6; 26:20-23.)  Womack told Reid he had a warrant out for her arrest and in order for her to prove she was not the same person in the warrant, made Reid remove all of her clothes except her bra in the front seat of his truck. (*Id*.) Reid did not report her confrontation with Womack until June 7, 2011. (*Id*.)

<u>Talia Buck</u>

Talia Buck ("Buck") was pulled over by Womack on November 26, 2010, on a claim of no auto insurance. (Ex. 20, Buck Depo. 9:23-12:7.)  Buck told Womack "I know that they are not expired because I just got them [insurance cards] in the mail from my mom." (*Id*.)  Womack then claimed he found a warrant for Buck's arrest, and coaxed her to show him she had no tattoos on her lower abdominal and pelvic areas, purportedly to rule her out as the woman with the warrant. (*Id*.)  After the encounter Buck told her mother what happened and Buck's mother called the BECSO to complain. (Ex. 20, Buck Depo.)  Buck did not hear anything for two days so she made another call to the Sheriff's Office and was told to fill out and send in the complaint form, which she did. (*Id*.)  The BECSO later said they had lost Buck's complaint form, which required her to re-send it. (*Id*.)

<u>Sarah Sorensen Testimony</u>

On October 4, 2012, Sheriff Yeates appeared in the law offices of Robert B. Sykes ("Law Office"), with his counsel, Frank Mylar, to finish his deposition testimony in the current case. (Dkt. No. 130 at 3.)  Frank Mylar has held numerous depositions over the years at the Law

Office and was typically allowed to use the conference room to meet with his clients while they waited for depositions to begin. (*Id*.) However, on this occasion, the conference room was not available, so Frank Mylar, and his client Sheriff Yeates, were required to meet in the waiting area inside the Law Office. (*Id*.) The waiting area is inside the closed door of the Law Office and is approximately 12 feet wide by 20 feet long. (Dkt. No. 121-1.) Frank Mylar does not recall seeing anyone sitting at the desk in the waiting area when he began speaking to Sheriff Yeates, but does recall seeing a woman sitting behind the desk when he later proceeded to go to the deposition room. (Defs.' Obj. at 4.)

Sorensen, who is employed by Robert B. Sykes & Associates as a paralegal, was assigned to sit at the front desk of the Law Office waiting room on October 4, 2012. (*Id*.) Sorensen is also the daughter of Robert B. Sykes, the attorney for Plaintiffs Reid and Griffin. (Dkt. No. 130 at 4.) Sorensen testified in her affidavit that while Sheriff Yeates and Frank Mylar were waiting for the deposition to start they were "talking in low, but audible voices." (Sorensen Aff. at iii.) Sorensen also states "I was not eavesdropping, but could not fail to hear the conversation, which was in voices above a whisper." (*Id*.) Furthermore, Sorensen states "[T]he men were talking about Jami Ruppe's complaint to Box Elder County. I distinctly heard Sheriff Yeates say the following, among other things, 'I heard about it in September of 2010.' This was in reference to Jami Ruppe's complaint." (*Id*.) Sorensen reported what she heard to Robert B. Sykes before he took Sheriff Yeates' deposition. (*Id*.) Robert B. Sykes told Sorensen to put it in writing and to send him an email, which she did. (*Id*.) The email Sorensen sent to Bob Sykes relayed the information found in her affidavit. (Pls.' Ex. 1.) However, in the email Sorensen wrote "I *believe* this was said in reference to Jami Ruppe's complaint."

Regarding Mrs. Sorensen's testimony, Defendants filed an Objection to Plaintiffs use of

Sarah S. Sorensen's Affidavit in Opposition to Defendants' Motion for Summary Judgment. The court heard oral arguments on the objection at the April 30, 2014, hearing after which the court took the matter under advisement. The court has considered the memoranda and other materials submitted by the parties, as well as the law and facts relating to the objection. Now being fully advised, the court sustains Defendants' objection.

<u>Attorney-Client Privilege</u>

Defendants assert that the conversation between Sheriff Yeates and his attorney Frank Mylar is protected by the attorney-client privilege. Plaintiffs claim the conversation is not protected by the attorney-client privilege because it was overheard by Sorensen.

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." (*Id*). The privilege serves the client's need for legal advice, but it also serves the attorney's need to receive complete information in order to give the proper advice. *See id.* at 390, 101 S.Ct. 677; *see also* 8 John Henry Wigmore, *Evidence* § 2291 (John T. McNaughton rev.1961); Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* 3 (4th ed.2001). Under the common law, a critical component of the privilege "is whether the communication between the client and the attorney is made in confidence . . . and under circumstances from which it may reasonably be assumed that the communication will remain in confidence." *United States v. Lopez,* 777 F.2d 543, 552 (10th Cir.1985).

Because confidentiality is key to the privilege, "[t]he attorney-client privilege is lost if the client discloses the substance of an otherwise privileged communication to a third party." *United States v. Ryans,* 903 F.2d 731, 741 n. 13 (10th Cir.1990).  The Tenth Circuit has stated, "the confidentiality of communications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived. *In re Qwest Commc'ns Int'l Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006).  The attorney-client privilege only covers those communications which are intended to be confidential. *U.S. ex rel. Stone v. Rockwell Int'l Corp.*, 144 F.R.D. 396, 400 (D. Colo. 1992).  Where there is no expectation that the information conveyed will be kept confidential, the basis for affording it protection under the attorney-client privilege is absent. (*Id*).

The facts show that reasonable and sufficient steps were taken by Sheriff Yeates and his attorney to ensure their conversation in the waiting room of the Law Office was confidential and would be protected by the attorney-client privilege.  Those steps include: (1) they went to the only space reasonably available; (2) the conversation was between an attorney and his client; (3) they spoke in hushed tones; (4) the conversation took place just before a deposition, where such a conversation was clearly to be expected and necessary; and (5) they were unaware that anyone else was present in the waiting room.  *Hofmann v. Conder*, 712 P.2d 216 at 217 n.2 (Utah 1985), (concluding that "the privilege is not lost if a third person whose presence is not otherwise justified overhears a confidential attorney-client communication without the client's knowledge, so long as reasonable precautions were taken to protect against overhearing"); *see United States v. Bump*, 605 F.2d 548, 550 (10th Cir. 1979) (An important element of the lawyer-client privilege is a showing that the communication was meant to be kept secret).

<u>Rule 403 of the Federal Rules of Evidence</u>

If the court were to find the conversation between Sheriff Yeates and his attorney not to be protected by the attorney-client privilege, the court would still sustain Defendants' objection pursuant to Rule 403 of the Federal Rules of Evidence. Under Rule 403 the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Under the circumstances, probative value is minimal especially because Sorensen stated "I *believe* this was said in reference to Jami Ruppe's complaint." Against this low probative value there is a danger of unfair prejudice and undue delay because Plaintiffs did not disclose Sorensen on their witness list and Defendants did not have a chance to depose her before trial.

## **SUMMARY JUDGMENT**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013) (internal quotation marks omitted). The nonmoving party may not, however, "rest on mere allegations or denials of [its] pleading, but must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Libberty Lobby*, 477 U.S. 242, 256 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient [to overcome summary judgment]; there must be evidence on which the jury could reasonably find for [the non-moving party]." *Id.*

## I.     Legal Standards for Individual and Municipal Liability

### A.     Individual Liability

The individual Defendant in this case is Sheriff Yeates, who was in a supervisory position over Womack.  The United States Court of Appeals for the Tenth Circuit has referred to claims against supervisors as based on "supervisory liability," *see, e.g., Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988), though this label can often be misunderstood as implying vicarious liability.  "Section 1983 does not authorize liability under a theory of respondeat superior."  *Brown v. Montoya*, 662, F.3d 1152, 1164 (10th Cir. 2011).  For this reason the Supreme Court has suggested the term "supervisory liability" is "a misnomer." *Ashcroft v. Iqbal*, 556 U.S. 662, 677, (2009).  "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.*

The Plaintiffs in this case therefore must show an "affirmative link" between the supervisor (Sheriff Yeates) and the constitutional violation. *Dodds v. Richardson*, 614, F.3d 1185, 1195 (10th Cir. 2010).  This requires more than "a supervisor's mere knowledge of his subordinate's" conduct.  *See Iqbal*, 556 U.S. at 677.  This notion is embodied in the three elements required to establish a successful § 1983 claim against a defendant based on supervisory responsibilities: (1) personal involvement; (2) causation; and (3) culpable state of mind. *Dodds*, 614 F.3d at 1195.  We will address each in turn.

### i.     Personal Involvement

"Individual liability under § 1983 must be based on [the defendant's] personal involvement in the alleged constitutional violation." *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997).  Before the Supreme Court's decision in *Iqbal*, the Tenth Circuit allowed a plaintiff to establish personal involvement in several ways, for example, "by demonstrating [a

defendant's] personal participation, his exercise of control or direction, or his failure to supervise." *Dodds*, 614 F.3d at 1195. "A defendant supervisor's promulgation, creation, implementation, or utlilization or a policy that caused a deprivation of plaintiff's rights also could have constituted sufficient personal involvement." *Id*. However, *Iqbal* articulated a stricter standard of liability for this first element of personal involvement. *See Dodds*, 614 F.3d at 1199. In *Iqbal*, the Supreme Court explained that "[b]ecause vicarious liability is inapplicable to … § 1983 suits, a plaintiff must plead that each Government official defendant, through the official's own individual actions, has violated the Constitution." 556, U.S. at 676.

### ii.  Causation

The causation element requires Plaintiffs to show that the Defendants' alleged actions caused the constitutional violation. "A plaintiff [must] establish the 'requisite causal connection' by showing 'the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.'" *Dodds*, 614 F.3d at 1185.

For example, in *Poolaw*, a plaintiff brought a § 1983 claim against two police supervisors involving a police search of the plaintiff's home. 565 F.3d at 726-27. The Tenth Circuit determined that the search was not supported by probable cause and therefore violated plaintiff's Fourth Amendment rights. *Id*. at 732. The police supervisors were not present during the search, but they ordered the search and swore out the affidavit in support of the search warrant. *Id*. at 733. The Tenth Circuit concluded that the supervisors' actions "set in motion a series of events" they reasonably should have known would result in the search. *Id*. The plaintiff therefore satisfied the causation element for summary judgment purposes. *Id*.

### iii. State of Mind

The state of mind element requires the plaintiff to show that the defendant took the alleged actions with the requisite state of mind. Precisely what state of mind is required for individual liability depends on the type of claim a plaintiff brings. *See Iqbal,* 556 U.S. at 676; *Dodds,* 614 F.3d at 1204–05. Plaintiffs assert violations of their right to bodily integrity, which is a substantive-due-process claim. *See Abeyta ex rel. Martinez v. Chama Valley Indep. Sch. Dist., No. 19,* 77 F.3d 1253, 1255 (10th Cir.1996). Deliberate indifference is the standard for a claim of violation of substantive due process. *Dodds*, 614 F.3d at 1205.

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs v. Brown,* 520 U.S. 397, 410 (1997). Deliberate indifference can be satisfied by evidence showing that the defendant "knowingly created a substantial risk of constitutional injury." *Dodds,* 614 F.3d at 1206. "[A] local government policymaker is deliberately indifferent when he deliberately or consciously fails to act when presented with an obvious risk of constitutional harm which will almost inevitably result in constitutional injury of the type experienced by the plaintiff." *Hollingsworth v. Hill,* 110 F.3d 733, 745 (10th Cir. 1997) (internal quotation marks omitted).

### B. Municipal Liability

To show liability for a governmental entity under 42 U.S.C. § 1983 for an alleged constitutional violation, Plaintiffs must show (1) a constitutionally defective policy or custom, (2) that the final policymaker who implemented the policy or custom acted with "deliberate indifference" to the constitutional rights of the plaintiff, and (3) that the policy or custom "directly caused" and was the "moving force" behind an underlying constitutional violation that

caused the constitutional harm." *See generally, Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397 (1997).

      C.  <u>Official Policy or Custom</u>

In *Monell*, the Supreme Court stated that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." 436 U.S. at 691, 98 S.Ct. 2018. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

"The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1982). A challenged practice may be deemed an official policy or custom for § 1983 municipal-liability purposes if it is a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision. *See* Martin A. Schwartz, *Section 1983 Litigation Claims & Defenses,* § 7.06[A] (2013), available at Westlaw SNETLCD. In *City of Canton v. Harris*, the Court explained that indirect misconduct is also actionable under § 1983, where the insufficiency "amounts to deliberate indifference to the constitutional rights of persons with whom the police come into contact." 489 U.S. 378, 379 (1989).

      D.  <u>Causation</u>

To establish the causation element, the challenged policy or practice must be "closely related to the violation of the plaintiff's federally protected right." Schwartz, at § 7.12[B]. This

requirement is satisfied if the plaintiff shows that "the municipality was the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404.

Plaintiffs must "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* Municipal liability in a § 1983 case cannot be established on a theory of vicarious liability. "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* at 405. "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." Schwartz, at § 7.12.

E. State of Mind

"[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Brown*, 520 U.S. at 407.

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction[.]

*Barney*, 143 F.3d at 1307 (citations and internal quotation marks omitted).

## II.  Analysis of Plaintiffs' Claims

Plaintiffs allege that both Sheriff Yeates and BECSO are liable because of inadequacies in (1) BECSO's citizen complaint policy, and (2) in the training and supervision of BECSO's officers.  The court will address each claim in turn as to each Defendant.

### A.  Defendants' Citizen Complaint Policy

#### 1.  Sheriff Yeates' Liability

The Plaintiffs in this case must show an "affirmative link" between Sheriff Yeates as Womack's supervisor and the constitutional violation. *Dodds v. Richardson*, 614, F.3d 1185, 1195 (10th Cir. 2010).  As discussed above, this requires more than "a supervisor's mere knowledge of his subordinate's" conduct.  *See Iqbal*, 556 U.S. at 677.

Plaintiffs assert that BECSO's citizen complaint policy was inadequate because there was no policy to investigate citizen complaints during the summer and fall of 2010, and that Sheriff Yeates is liable for the constitutional violations against Plaintiffs.  In support, Plaintiffs assert Sheriff Yeates acted with deliberate indifference regarding two citizen complaints made by Nielson and Ruppe in August 2010, and one complaint made to Sheriff Yeates' wife Lynda Yeates sometime in November 2010 regarding roadside interactions with Womack.

Conversely, Sheriff Yeates testified in his deposition that the County did have an adequate citizen complaint policy during the summer and fall of 2010 and that had Nielson, Ruppe, and Gibbs utilized it, Womack would have been under investigation earlier and the Plaintiffs' constitutional right would likely not have been violated.  Sheriff Yeates testified that he was never put on notice of Nielson or Ruppe's complaints.  Sheriff Yeates also testified that as soon as his wife told him of Gibbs interaction with Womack, he promptly ordered an investigation of Womack.

B. Complaints made by Nielson, Ruppe, and Gibbs

Nielson was pulled over by Womack sometime in mid-August, 2010. Nielson testified at her deposition that she spoke to a state dispatch employee, not Sheriff Yeates or any BECSO employee. It would be impossible for the citizen complaint policy to be deemed inadequate or to hold Sheriff Yeates liable in this instance given the evidence Plaintiffs offer regarding Nielson's complaint because Nielson never called or spoke with Sheriff Yeates or anyone at BECSO. Plaintiffs have failed to offer any evidence that shows Sheriff Yeates personally violated their constitutional rights with regard to Nielson's complaint because Plaintiffs cannot show Sheriff Yeates ever had notice of it.

Ruppe was pulled over by Womack on August 20, 2010, which was a Friday. Ruppe testified at her deposition that she called the number for the BECSO the next day to complain about Womack's conduct and spoke with Sheriff Yeates' secretary. It is undisputed that the next day was Saturday and it is also without dispute that no administrative staff was in the BECSO so State Dispatch would have fielded the call, not a BECSO employee. Accordingly, Plaintiffs offer no evidence that any BECSO employee ever spoke with Ruppe regarding her confrontation with Womack or that Sheriff Yeates was notified of Ruppe's confrontation with Womack in August, 2010.

In addition, Ruppe testified that she used her own envelope to send a written complaint to BECSO. The BECSO policy at that time was to mail complainants a pre-stamped envelope addressed to the officer's supervisor at the BECSO. Since Ruppe used her own envelope and did not mention anything about the supervisor, it could not have been a BECSO complaint form that she filled out. Plaintiffs have failed to offer any evidence that shows Sheriff Yeates personally

violated Plaintiffs' constitutional rights regarding Ruppe's complaint because Plaintiffs cannot show Sheriff Yeates ever received notice of it.

Gibbs was pulled over by Womack on October 1, 2010. Gibbs testified at her deposition that she did not call or submit a written complaint to Sheriff Yeates or to anyone employed by BECSO. Gibbs testified that she told Sheriff Yeates wife, Lynda Yeates, about her confrontation with Womack and that Lynda Yeates cut her off before she could go into specifics. Sheriff Yeates testified, as did Lynda Yeates, that he was only told that Womack asked to look at Gibbs' tattoos in order to determine if Gibbs was the person Womack had a warrant to arrest and was not presented with any additional details of the event. Sheriff Yeates did testify, and it is undisputed, that he thereafter took immediate action to start an investigation.

Gibbs also testified that she was unsure of the exact date she told Mrs. Yeates about her interaction with Womack, but testified that it may have been a month to the day Womack pulled her over, which would have been November 1, 2010. This date is inconsistent with Sheriff Yeates and Lynda Yeates' testimony. Lynda Yeates testified that she told Sheriff Yeates about Gibbs confrontation with Womack around Thanksgiving, on November 21or 22. This statement is substantiated by the fact that Sheriff Yeates' day planner has an entry reading "SWO" on November 22, 2010. This statement is also substantiated by the fact that Lynda Yeates testified that she saw Sheriff Yeates write an entry in his day planner after she spoke with him about Gibbs interaction with Womack. Sheriff Yeates testified that "SWO" is a reference to Sgt. Womack and the entry was made after Lynn Yeates told him about Gibbs interaction with Womack. It is undisputed that Gibbs was unsure about the exact date she talked to Lynda Yeates because she testified that she could be off on her dates because it has been two years since her interaction with Womack.

Plaintiffs assert that Sheriff Yeates had actual notice of all three of the complaints above and that his inaction allowed Womack to sexually assault Plaintiffs Reid, Griffin, and Buck. This is key to their case. However, they lack facts to support their claims. The facts, taken in the light most favorable to Plaintiffs, show the first time Sheriff Yeates was put on notice of Womack's conduct was around Thanksgiving, on November 21or 22, 2010. The following Monday Sheriff Yeates ordered an investigation of Womack. Sheriff Yeates cannot be held liable for the constitutional violations of Reid or Griffin because there is no admissible evidence that he had knowledge of Womack's conduct at the time they were pulled over. Sheriff Yeates cannot be held liable for the constitutional violation suffered by Buck because all Sheriff Yeates knew at that point was what his wife told him about Gibbs interaction with Womack, which was that Womack had asked to look at her tattoos.

In addition, there is insufficient evidence to support Plaintiffs' claims that the citizen complaint policy was constitutionally inadequate. Buck's mother called the BECSO to complain about her daughter's confrontation with Womack on November 27, 2010. Buck was mailed a pre-stamped envelope addressed to Womack's supervisor Sgt. Spencer. Buck filled it out and mailed it back to the Sheriff's Office putting Womack's supervisor on notice of Womack's unconstitutional conduct toward Buck.

The evidence shows that if Nielson, Ruppe, or Gibbs had actually spoken with an employee at the BECSO or with Sheriff Yeates, the County's citizen complaint policy would likely have been similarly followed. Plaintiffs do not offer any evidence to show otherwise. The claim that the citizen complaint policy was inadequate as it relates to Sheriff Yeates fails for lack of evidence sufficient to show an "affirmative link" between Sheriff Yeates and the deprivation

of Plaintiffs constitutional rights.  No reasonable jury could conclude, based on Plaintiffs' facts, that the County's citizen complaint policy was constitutionally inadequate.

i.      Box Elder County's Liability

To show liability for a governmental entity under 42 U.S.C. § 1983 for an alleged constitutional violation, Plaintiffs must show (1) a constitutionally defective policy or custom, (2) that the final policymaker who implemented the policy or custom acted with "deliberate indifference" to the constitutional rights of the plaintiff, and (3) that the policy or custom "directly caused" and was the "moving force" behind an underlying constitutional violation that caused the constitutional harm." *See generally, Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397 (1997).

As stated above, Plaintiffs assert that BECSO's citizen complaint policy was inadequate because there was no policy to investigate citizen complaints during the summer and fall of 2010, and that the County and Sheriff Yeates, as the final policymaker for law enforcement activities in Box Elder County, are liable for the constitutional violations against Plaintiffs.

This claim fails for the same reasons Sheriff Yeates cannot be held liable for the deprivation of Plaintiffs' constitutional rights.  First, as addressed above, Plaintiffs have failed to present sufficient evidence to show the citizen complaint policy used in the summer and fall of 2010 was constitutionally defective, and second, there is insufficient evidence to show that Sheriff Yeates acted with deliberate indifference to the complaints made by Nielson, Ruppe, or Gibbs because there is no evidence he had notice of the complaints, until his wife told him about Gibbs interaction with Womack, whereupon Sheriff Yeates ordered an immediate investigation.

Accordingly, no reasonable jury could conclude that the county's citizen complaint policy was constitutionally inadequate.

C. <u>Training and Supervision</u>

  i. Sheriff Yeates and Box Elder County's Liability

  "A Municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 131 S. Ct. at 1359. "Section 1983 imposes liability on a government official who 'subjects, or causes to be subjected, any citizen … to the deprivation of any rights.'" *Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012). Like deliberate indifference, causation is an element of Plaintiffs' Section 1983 claims. *See Id.* at 1255. Causation is generally a question of fact for the jury, but whether the plaintiff has presented sufficient evidence to defeat a motion for summary judgment is a legal question. *Henry v. Merck & Co., Inc.*, 877 F.2d 1489, 1495 (10th Cir. 1989).

  A causal connection is satisfied if Defendants set in motion a series of events that Defendants knew or reasonably should have known would cause others to deprive Plaintiffs of their constitutional rights. *Martinez*, 697 F.3d at 1255. The premise of Plaintiffs' training and supervision claims are that had the County and Sheriff Yeates properly trained and supervised Womack it would have prevented the deprivation of Plaintiffs' constitutional rights. Plaintiffs have not presented sufficient evidence to meet this burden.

  In addition to the supervision provided for BECSO employees by Sheriff Yeates and the County, the Utah State Peace Officers Standards and Training Division ("POST") is a certifying body required to certify all law enforcement officers under state law. (Defs.' MSJ at iii.) POST also receives and investigates citizen complaints. (*Id.*) Box Elder County required all road deputies to have POST certification and training along with continuing education training. (*Id.* at iv.) All POST certified law enforcement officers go through academic and physical training to enforce the laws, to stop criminal conduct such as sexual assault, and to bring to justice those

who violate the law. (Defs.' Reply at 13.)  Additionally, Sheriff Yeates instituted on the job training called FTO training to train and retrain every road deputy when they first begin and when they return to being a road deputy. (*Id*.)  Womack received the required trainings.  POST and Sheriff Yeates both require ongoing training relating to Fourth Amendment and sexual harassment issues. (*Id*.)

"[T]here are limited circumstances in which an allegation of a 'failure to train' can be the basis for [municipal] liability under § 1983." *City of Canton,* 489 U.S. at 387. "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388. A municipality can be liable where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390.

Plaintiffs' training and supervision claims assert that Sheriff Yeates' continual inaction coupled with the failure to train staff to bring complaints forward and to supervise administrative personnel in the BECSO satisfies the deliberate indifference standard.  However, Plaintiffs fail to present sufficient evidence to support their claims.  Without notice of a deficiency in a particular respect, "decision makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 131 S. Ct. at 1360.

In addition to the County's policy for citizen complaints, Sheriff Yeates was well aware of the fact that the State, through POST, also has a citizen complaint procedure where it independently investigates citizen complaints against police officers.  Sheriff Yeates has testified he was not aware of any significant complaints against any of his officers, whether originating

from POST or otherwise prior to November 21or 22, 2010, when his wife told him about Gibbs interaction with Womack.  Plaintiffs offer no evidence to suggest that there was a wide spread or pervasive problem regarding officer misconduct, and no evidence suggests that Sheriff Yeates acted with deliberate indifference to a substantial and serious risk of harm to Plaintiffs.

Plaintiffs fail to show, as the law requires, that the need for more or different training was so obvious that a violation of Plaintiffs' constitutional rights was likely to result from not providing it.  Accordingly, Plaintiffs claims that their constitutional rights were violated due to Sheriff Yeates and Box Elder County's failure to train Womack fails as a matter of law.

Plaintiffs claim that Womack's deficient personal logs[1] and his dash-cam malfunction demonstrate a failure to supervise and that had Sheriff Yeates and/or the County done more to supervise Womack, Plaintiffs' constitutional rights would not have been violated.  However, at the very most, such failures could only amount to a negligent supervision claim[2] and then only against Womack's supervisor, Sgt. Spencer.  Plaintiffs have offered no evidence to show Sheriff Yeates had any notice that there were problems with Womack's logbooks or his dash-cam. Without such notice to Sheriff Yeates as policymaker there can be no county liability for failure to supervise or train. *See Connick v. Thompson*, 131 S. Ct. at 1360; *Schneider v. Grand Junction*, 717 F.3d at 772.  It is undisputed that Sgt. Spencer did not know about Womack's deficient logbooks and dash-cam until the investigation was under way following Gibbs and Buck's complaints.  Hindsight knowledge is an insufficient basis for supervisor liability in Section 1983 claims. *Schneider*, 717 F.3d at 776.

---

[1] Plaintiffs claim Womack's log books were deficient because they were incomplete, and had Sheriff Yeates reviewed them before Womack pulled over Plaintiffs, it would have prevented Plaintiffs injuries.
[2] Negligence and even gross negligence is insufficient to show a constitutional violation. *See Bryan County v. Brown*, 520 U.S. 397, 407 (1997).

In addition, Sgt. Spencer testified at his deposition that none of the logbooks or dash-cam footage he reviewed contained any helpful information relating to Womack's conduct. Sgt. Spencer's testimony is substantiated by Womack's testimony that his dash-cam was not working during the summer and fall of 2010. So, even if Sgt. Spencer reviewed the dash-cam footage prior to Buck and Gibbs interactions with Womack, it would not have revealed Womack asking to inspect tattoos.

Furthermore, no supervisor is required or expected to regularly review dash-cam footage or daily logs of all of its officers when there is no known or suspected problem. Sheriff Yeates was not tasked with the responsibility of directly supervising line patrol deputies like Womack. The supervision of line patrol deputies was the job of the direct supervisor, which in Womack's case was Sgt. Spencer. Any failure to supervise by Sgt. Spencer cannot be attributed to the county because there is no vicarious liability under Section 1983 and supervisors are only liable for their own unconstitutional acts. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).[3]

Plaintiffs offer no evidence that shows Sheriff Yeates or the County failed to supervise Womack. Mere speculation and hindsight that something more should have been done to protect Plaintiffs' constitutional rights is not sufficient to establish causation. Accordingly, Plaintiffs have failed to satisfy the burden of presenting sufficient evidence of causation for their failure to

---

[3] Plaintiffs filed a Motion to Strike Defendants' Pleadings & for Entry of Default. (Doc. No. 123.) Plaintiffs assert that Defendants destroyed or failed to preserve Womack's logbooks, his dash-cam data, his monthlies, and all statistical data flowing therefrom, which caused them to be prejudiced in their ability to prove that Defendants failed to supervise Womack. (*Id*. at 9.) However, even if this evidence existed and was preserved, Plaintiffs assertion that Defendants failed to supervise Womack fails for the same reasons the court expressed above. Specifically, the supervision of line patrol deputies is the job of their direct supervisor, which in Womack's case was Sgt. Spencer. Any failure to supervise by Sgt. Spencer cannot be attributed to the County or Sheriff Yeates because there is no vicarious liability under Section 1983 and supervisors are only liable for their own unconstitutional acts. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

supervise claims against Sheriff Yeates and the County, and no reasonable jury could find otherwise.

### III.     Qualified Immunity

Plaintiffs assert Sheriff Yeates is not entitled to qualified immunity because he knew Womack was conducting illegal searches and acted with deliberate indifference allowing Womack to deprive Plaintiffs of their constitutional rights.  However, as discussed above, Plaintiffs have not offered any evidence that shows Sheriff Yeates knew of Womack's conduct before Plaintiffs were deprived of their constitutional rights.

There is no qualified immunity where plaintiff has suffered a violation of her constitutional rights, and those rights were clearly established at the time of the defendant's misconduct. *See Keith v. Koerner*, 707 F.3d 1185, 1188 (10th Cir. 2013).  Where a clearly established right is violated, qualified immunity fails if the supervisor has an "affirmative link" between the constitutional violation, showing "(1) personal involvement; (2) sufficient causal connection, and (3) state of mind." *Dodd v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010.)

It appears clear in this case that the Plaintiffs' constitutional rights were violated by Womack.  However, in order for Sheriff Yeates, in his supervisory capacity, and the County to be held liable for Womack's conduct Plaintiffs must offer evidence that shows Sheriff Yeates acted with deliberate indifference which caused the violation.  *See Tafoya v. Salazar*, 516 F.3d 912, 916, 922 (10th Cir. 2008).

As addressed in detail above, the evidence presented by Plaintiffs does not show Sheriff Yeates or any BECSO employee knew about Womack's conduct before Plaintiffs' constitutional rights were violated.  To the contrary, the evidence shows Sheriff Yeates did not hear about the complaints by Nielson or Ruppe until after the investigation of Womack ended a year later.

Plaintiffs' evidence tends to show Sheriff Yeates actions were anything but deliberately indifferent after being put on notice of Womack's conduct because Sheriff Yeates ordered an investigation of Womack soon after his wife told him about her conversation with Gibbs around November 21or 22, 2010.

Plaintiffs have failed to offer any evidence to show Sheriff Yeates was personally involved in the deprivation of Plaintiffs' constitutional rights. Plaintiffs have also failed to offer any evidence to show Sheriff Yeates' conduct caused the deprivation of Plaintiffs' constitutional rights. Furthermore, Plaintiffs' have failed to offer any evidence that shows Sheriff Yeates acted with deliberate indifference allowing Womack to deprive Plaintiffs of their constitutional rights. Accordingly, although because of lack of evidence against them they face no liability, to the extent the issue needs to be addressed, the court finds Sheriff Yeates and the County are also covered by qualified immunity.

## IV.     Plaintiffs' Utah Constitutional Claims

Plaintiffs brought claims under the Utah Constitution for Womack's misconduct and incorporated the County's failure to train, supervise, and take remedial action against Womack. Plaintiff Buck notified Defendants that all Plaintiffs intended to pursue these claims under both the United States Constitution and the Utah Constitution. Plaintiffs assert that the Utah Constitution provides for remedies at law, which are broader than, and not cognizable under, Section 1983. Plaintiffs claim that this court, pursuant to *Spackman v. Board of Education*, 2000 UT 87, ¶ 20, 16, P.3d 533, 537, should apply Utah common law if Plaintiffs do not prevail on their Section 1983 claim because the Utah Constitution does not specifically provide damage remedies. Under *Spackman*, Utah State Constitution claims stand if (1) plaintiff suffers a flagrant violation of her constitutional rights, (2) existing remedies do not redress her injuries,

and (3) equitable relief is wholly inadequate. *Spackman*, 2000 UT 87, ¶¶ 23-25, 16 P.3d 533, 538-539.

Conversely, Defendants assert, and this court agrees, that Plaintiffs' Utah Constitutional claims are not cognizable and Plaintiffs have failed to meet the three requirements found in *Spackman*. The facts suggest that Plaintiffs have met the first requirement found in *Spackman*, that they have suffered a flagrant violation of their constitutional rights. However, Plaintiffs have failed to meet the second requirement, showing that existing remedies do not redress their injuries. Plaintiffs can seek damages against Womack under both the federal and state constitutions. Plaintiffs claim that Womack caused their injuries and they have viable claims asserted against him. Accordingly, Plaintiffs' Utah Constitutional claims are not cognizable, and are dismissed against Sheriff Yeates and the County.

### CONCLUSION

For the foregoing reasons, Defendants' Objection to Plaintiffs use of the Affidavit of Sarah S. Sorensen in Opposition of Defendants' Motion for Summary Judgment is SUSTAINED; Defendants' Motion for Summary Judgment is GRANTED; and Plaintiffs' Motion to Strike Defendants' Pleadings & for Entry of Default is DENIED.

DATED this 13th day of August, 2014.

_____
Dee Benson
United States District Judge